IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50636
_____


SIERRA CLUB,

                              Plaintiff-Appellee,
                    versus

CITY OF SAN ANTONIO, ET AL,

                              Defendants,

NEW BRAUNFELS UTILITIES,

                              Defendant-Appellee,

                    versus


CITY OF SAN ANTONIO, SAN ANTONIO WATER SYSTEMS, CITY OF
HONDO, TEXAS, On Its Behalf and All Other Municipal
Industrial, Commercial, Domestic and Livestock Pumpers in
Medina, CITY OF UVALDE, TEXAS, On Its behalf and All Other
Municipal, Industrial, Commercial, Domestic and Livestock
Pumpers in Uvalde and Kinney Counties, CITY OF LEON VALLEY,
TEXAS, On Its Behalf and All Other Municipal, Domestic and
Livestock Pumpers in Bexar and Atascosa Counties, REDLAND
STONE PRODUCTS COMPANY, On Its Behalf and All Other
Industrial and Commercial Pumpers, SOUTHWEST RESEARCH
INSTITUTE, On Its Behalf and All Other Industrial and
Commercial Pumpers in Bexar and Atascosa Counties, UNITED
SERVICES AUTOMOBILE ASSOCIATION, On Its Behalf and All Other
Industrial and Commercial Pumpers in Bexar and Atascosa
Counties, and BEXAR METROPOLITAN WATER DISTRICT,

                              Defendants-Appellees.


_____

          Appeals from the United States District Court for
                 the Western District of Texas
_____
                        April 30, 1997

Before REAVLEY, GARWOOD and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

This appeal is taken from a preliminary injunction entered by the district court to regulate the withdrawal of water from the Edwards Aquifer, a large underground reservoir supplying water to central Texas.  Because we hold that the Sierra Club did not establish a substantial likelihood of success on the merits, in light of the abstention doctrine enunciated in *Burford v. Sun Oil Co.*,[1] we vacate the injunction.

BACKGROUND

The City of San Antonio relies exclusively on the Edwards Aquifer for its water.  Other parts of central Texas also rely on the aquifer as a primary source of water.  It supplies over one million people with water in San Antonio alone.

The aquifer discharges water into the Guadalupe River Basin at the San Marcos and Comal Springs.  According to the Sierra Club the annual recharge of the aquifer for several years has been exceeded by the annual discharge (withdrawals plus springflow), causing the aquifer level to fall each year.  It claims that a continuation of the status quo inevitably will either lead to the complete drying up of the springs or render them intermittent.

In the area of the San Marcos and Comal Springs, the aquifer is home to five plant and animal species designated as endangered or threatened under the Endangered Species Act.[2]  Of the five,

---

[1]  319 U.S. 315 (1943).

[2]  16 U.S.C. §§ 1531-44.

one -- the fountain darter -- is found at Comal Springs.  The fountain darter is an endangered species.

In 1996 the aquifer suffered a severe drought.  The spring flow at Comal Springs fell from April through June and then leveled off.  In June of 1996, the Sierra Club's expert zoologist observed five or six "very thin" fountain darters in the uppermost spring run of Comal Springs.  The Sierra Club claims that it presented direct evidence of fountain darter deaths, injuries in the form of emaciation, and a scarcity of young fountain darters due to the low spring flows, and that there is a causal link between the low spring flows and defendants' pumping of water from the aquifer.  San Antonio's hydrology expert stated that he did not anticipate further declines in the water levels after August 1, 1996, and that the water level would rise in the fall.

In a prior suit, *Sierra Club v. Babbitt*,[3] filed in 1991 in the same district court, the Sierra Club sued the Secretary of the Interior and the United States Fish and Wildlife Service under the Endangered Species Act.  The suit claimed that the Fish and Wildlife Service had failed to adopt an "adequate recovery plan" under that Act.  This suit lasted five years, and included several appeals to the Fifth Circuit.  In one appeal our court recognized abstention concerns, and particularly *Burford* abstention, as sometimes calling for federal court abstention "to allow the state's comprehensive regulatory scheme to operate

_____

[3]  No. Mo-91-CA-069 (W.D. Tex.).

3

without the risk of competing attempts between that regulator and the federal courts to exercise control over the same entity."[4] On remand, the district court declined to abstain, because at the time the Edwards Aquifer Act[5] (described below) had been declared unconstitutional. The court reasoned that there was no competing state regulatory system in place that would make abstention appropriate under *Burford*. In 1996 this court ordered the *Babbitt* suit dismissed as moot after the Fish and Wildllife Service published a revised recovery plan.

The Sierra Club brought the pending suit in June of 1996 under the Endangered Species Act. The complaint, seeking certification of a defendant class, alleges that defendants are "taking" endangered species in violation of the Endangered Species Act.[6] The complaint seeks to enjoin defendants "to reduce withdrawals from the Edwards by such levels as are necessary to maintain minimum natural springflows from the Comal and San Marcos Springs for the conservation and survival of the endangered and threatened species living at and downstream from those springs." The named defendants include San Antonio and numerous other governmental and private entities.

---

[4] *Sierra Club v. Babbitt*, No. 94-50260 (5th Cir. Oct. 18, 1995), at 6.

[5] Act of May 30, 1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 2355, *as amended by* Act of May 29, 1995, 74th Leg., R.S., ch 261, 1995 Tex. Sess. Law Serv. 2505.

[6] *See* 16 U.S.C. § 1538(a)(1)(B).

4

In 1993 the Texas Legislature enacted the Edwards Aquifer Act, creating a regulatory scheme to control and manage the use of the aquifer.  An administrative body, the Edwards Aquifer Authority, was created to oversee this regulatory scheme.  A state district court ruled the Act unconstitutional, but in 1996 the Texas Supreme Court unanimously upheld the facial constitutionality of the Act.  *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618 (Tex. 1996).  The federal district court, in the *Babbitt* case, recognized that if the Texas Supreme Court were to uphold the constitutionality of the Edwards Aquifer Act, "this Court would do everything in its power to allow the [Authority] to function and nothing that would frustrate the [Authority]."

Shortly after the present suit was filed the Texas Supreme Court ruled in the *Barshop* case.  San Antonio and other defendants moved to dismiss the suit on *Burford* abstention grounds.  The Sierra Club moved for a preliminary injunction.  After a one-day evidentiary hearing, the court denied the motion to dismiss and entered the preliminary injunction now on appeal.[7]  The court concluded that "an emergency presently exists and takes of endangered species are occurring," and that "[w]ithout a fundamental change in the value the region places on fresh water, a major effort to conserve and reuse Aquifer water, and implemented plans to import supplemental supplies of water, the

---

[7]  This court has stayed the injunction pending appellate review.

5

region's quality of life and economic future is imperiled." The court incorporated by reference a "1996 Emergency Withdrawal Reduction Plan," which provides for comprehensive regulation of pumping from the aquifer.

In its order granting the injunction the court did not immediately impose the Emergency Withdrawal Reduction Plan, but did order limitations on pumping based on spring flows, the effect of which was that the municipal defendants were limited to water use of 1.2 times their winter usage. The court found that the Edwards Aquifer Authority "has a great learning curve to overcome before it is ready to manage the Aquifer." It ordered that the injunction remain in effect until the defendants can demonstrate that a critical management plan by the Edwards Aquifer Authority that will preserve endangered species is operative. It also ordered the parties to supply the court and a special master with monthly water usage information and all other information "necessary to keep the Court informed as to compliance with this Order."

DISCUSSION

The party seeking a preliminary injunction must establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) that the threatened injury outweighs any damage that the injunction will cause the opposing party, and (4) that the injunction will not disserve the public

6

interest.[8]  The decision to grant or deny a preliminary

injunction is reviewed for abuse of discretion.[9]  Likewise, we

generally review abstention decisions under an abuse of

discretion standard.[10]

The Sierra Club contends that the district court's decision

not to abstain under *Burford* is not properly before us on appeal,

but we find no merit to this argument.[11]  The issue before us is

not the ultimate question of whether the district court should

abstain, but whether the court properly entered a preliminary

injunction.  The latter question turns on whether the Sierra Club

---

[8]  *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).

[9]  *Id.*

[10] *American Bank and Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 922 n.6 (5th Cir. 1993).

[11] The Sierra Club argues that an order denying abstention is not appealable under *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988), and that the defendants are attempting an "end run" around this rule by treating their abstention argument as an appeal of an order granting an injunction.  There is no merit to this argument.  Whether the court should have abstained goes directly to whether the plaintiff was likely to succeed on the merits.  The defendants are entitled to raise this argument in this interlocutory appeal of the injunction, which is plainly allowed under 28 U.S.C. § 1292(a)(1).  *Gulfstream* did not involve an injunction.  It was an attempt to appeal the denial of a motion to stay or dismiss on abstention grounds.  The Sierra Club also cites *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975), which states that "the issuance of a preliminary injunction is not subject to the restrictions of *Younger*."  This case is inapposite because it was not discussing whether the refusal of a court to abstain is immediately appealable.  The quoted passage was part of a discussion of whether *Younger v. Harris*, 401 U.S. 37 (1971), applies to a plaintiff who has not yet been subjected to state criminal proceedings, to which the Court's answer was no.  The case did not discuss *Burford* abstention, nor did it discuss appealability of an abstention ruling.

established a substantial likelihood of success on the merits in the face of the *Burford* abstention doctrine.

The Sierra Club failed to meet the first requirement of a preliminary injunction -- a substantial likelihood of success on the merits -- because abstention appears so manifestly warranted under *Burford*. In *Burford*, plaintiff Sun Oil brought a federal suit challenging a Texas Railroad Commission order granting a drilling permit to defendant Burford. Sun Oil claimed the permit violated its due process rights. The Court held that the federal district court should have abstained, noting the comprehensive nature of the state regulatory scheme, the large interest of the state in regulating and conserving its oil and gas resources, and the need for a unified approach to granting permits by a single adjudicatory body.

Factually, *Burford* and our case are very similar. In *Burford*, the Court emphasized the elaborate and comprehensive nature of the state regulatory scheme in issue. It described the Railroad Commission order under consideration as "part of the general regulatory system devised for the conservation of oil and gas in Texas," noted that the Commission "carries out its functions of production control or proration by an elaborate system of orders, schedules, and reports," and that the state regulatory scheme provided a "well organized system of regulation and review."[12]

---

[12] 319 U.S. at 318, 320 n.12, 327.

8

Similarly, the Edwards Aquifer Act can fairly be characterized as a comprehensive regulatory scheme. It represents a sweeping effort by the Texas Legislature to regulate the aquifer, with due regard for all competing demands for the aquifer's water. The Act vests the Edwards Aquifer Authority with "all the powers and privileges necessary to manage, conserve, preserve, and protect the aquifer . . . ." The Authority controls withdrawals from the aquifer through a permit system. Section 1.25 of the Act charges the Edwards Aquifer Authority with developing "a comprehensive water management plan that includes conservation, future supply, and demand management plans." The Act also specifically addresses the preservation of endangered species. Under § 1.14 of the Act the Authority must "protect aquatic and wildlife habitat" and "protect species that are designated as threatened or endangered under applicable federal or state law." The Authority is empowered to file civil suits in state district court for an injunction. In addition, a separate entity, the Texas Natural Resource Conservation Commission, is authorized under § 1.39 of the Act to file suit for an order of mandamus against the Authority to compel the Authority to perform its duties.

*Burford* emphasized that the state regulatory scheme in issue concerned the "very large" interest of the state in conserving oil and gas, and that the Railroad Commission's regulation of oil and gas production was "of vital interest to the general public .

9

. . with implications to the whole economy of the state."[13]  The regulation of water resources is likewise a matter of great state concern.  As the Texas Supreme Court stated in *Barshop*, "[c]onservation of water has always been a paramount concern in Texas, especially in times, like today, of devastating drought."[14]  It characterized the Edwards Aquifer as "the primary source of water for residents of the south central part of this state.  It is vital to the general economy and welfare of the State of Texas."[15]  The court recognized that "the State has the responsibility under the Texas Constitution to preserve and conserve water resources for the benefit of all Texans."[16]  The Texas Legislature, speaking through § 1.01 of the Edwards Aquifer Act, found that the aquifer "is a unique and complex hydrological system, with diverse economic and social interests dependent on the aquifer for water supply."

The defendants correctly note that both the aquifer and the endangered species are entirely intrastate, which makes management of the aquifer a matter of peculiar importance to the state.[17]

---

[13] *Id*. at 320, 324-25.

[14] 925 S.W.2d at 626.

[15] *Id*. at 623.

[16] *Id*.

[17] The defendants separately argue that applying the Endangered Species Act to these circumstances is beyond the power of Congress to regulate interstate commerce and therefore unconstitutional.  The United States has urged that we not reach this issue unless, all other appellate challenges to the

The record in this case also illustrates the vital importance of the aquifer to the citizens of central Texas. For example, the president of the San Antonio Water System testified that the injunction's limitation of water use to 1.2 times average winter use would likely require the city to maintain lower water pressure than state law requires for fighting fires. A consulting engineer for the City of Leon Valley testified that the restrictions would necessitate the complete curtailment of outside watering, resulting in damage to 50% of the foundations in the city with damages to each home ranging from $2000 to $20,000. Other defendants offered similar evidence through affidavits.

As in *Burford*, there is a need for unified management and decision-making regarding the aquifer, since allowing one party to take water necessarily affects other parties. The Court in *Burford* noted that for many reasons "each oil and gas field must be regulated as a unit," that well spacing and proration "are a part of a single integrated system and must be considered together," and that "[t]he state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts."[18] The Court stressed the need for unitary enforcement of the regulatory scheme by noting the problem of drainage: "Since the oil moves through the entire

temporary injunction being first rejected, it becomes necessary to do so in order to resolve this appeal. We do not reach any constitutional issue.

[18] 319 U.S. at 319, 323 n.15, 333–34.

11

field, one operator can not only draw oil from under his own surface area, but can also, if he is advantageously located, drain oil from the most distant parts of the reservoir.  The practice of attempting to drain oil from under the surface holdings of others leads to offset wells and other wasteful practices; and this problem is increased by the fact that the surface rights are split up into many small tracts."[19]  The Court noted that "the physical facts are such that an additional permit may affect pressure on a well miles away.  The standards applied by the Commission in a given case necessarily affect the entire state conservation system."[20]

Similar concerns surely affect regulation of an aquifer.  As our court stated in the *Babbitt* appeal:

> [t]he Edwards aquifer contains a finite amount of water, and as such, the need for uniform regulation is paramount.  The Supreme Court has recognized that such circumstances sometimes require the federal courts to abstain to allow the state's comprehensive regulatory scheme to operate without the risk of competing attempts between that regulator and the federal courts to exercise control over the same entity.[21]

The opinion goes on to state that "[a]s with the oil fields at issue in [*Burford*], in the present case, Texas clearly has an interest in uniform decision-making regarding this finite amount of water."[22]

---

[19] *Id*. at 319.

[20] *Id*. at 324.

[21] Opinion at 6 (citing *Burford*).

[22] *Id*. at 6 n.4.

12

The Sierra Club argues that abstention is not warranted because it only seeks relief under a federal law, the Endangered Species Act. The district court noted in the *Babbitt* case that "*Burford* abstention normally arises in a case in which a federal court has diversity jurisdiction over exclusively state law issues." Our court has stated that one factor is deciding whether *Burford* abstention should apply is whether the cause of action arises under federal or state law.[23]

However, *Burford* itself states that abstention is appropriate whether jurisdiction is premised on diversity jurisdiction or otherwise, if the federal courts should, consistent with our federal system, afford comity to state governments in carrying out their domestic policy. The Court held: "Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, *whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise*, 'refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest'; for it 'is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.'"[24] *Burford* abstention does

---

[23] *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993).

[24] 319 U.S. at 317-18 (quoting *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 360 (1933) and *Pennsylvania v. Williams*, 294 U.S. 176, 185 (1935)).

13

not so much turn on whether the plaintiff's cause of action is alleged under federal or state law, as it does on whether the plaintiff's claim may be "in any way entangled in a skein of state law that must be untangled before the federal case can proceed."[25]  Moreover, our case is not distinguishable from *Burford* because the cause of action is based on federal law.  In *Burford* as well, the cause of action alleged was that the order of the Railroad Commission had denied plaintiffs "due process of law."[26]  If abstention is warranted when the plaintiff is claiming a violation of his constitutional rights, then surely it is also warranted where the plaintiff claims a federal statutory violation.

The district court reasoned that abstention was unwarranted because the Edwards Aquifer Authority had not had time to develop a plan for managing the aquifer and dealing with the emergency situation.  The record indicates that the Authority is in the process of taking comments and formulating rules for permits and emergency measures.  The State informs us in an amicus brief that the Edwards Aquifer Authority "is now established and has begun operations."  In a supplemental filing San Antonio points out that on December 19, 1996, the Authority issued final rules for filing and processing of permit applications, and for critical period management.

---

[25] *Quackenbush v. Allstate Ins. Co.*, 116 S. Ct. 1712, 1726 (1996) (quoting *McNeese v. Board of Ed. for Community Unit Sch. Dist.*, 373 U.S. 668, 674 (1963)).

[26] 319 U.S. at 317.

14

We do not believe that *Burford* abstention is applicable only where the state regulatory scheme is fully in place.  The Supreme Court has noted that "[w]e have since provided more generalized descriptions of the *Burford* doctrine, *see*, *e.g.* . . . *Colorado River* (abstention where 'exercise of federal review of the question in a case and in similar cases would be disruptive of state *efforts to establish* a coherent policy with respect to a matter of substantial public concern')".[27]

The only significant factual distinction between our case and *Burford* -- that the Railroad Commission's regulatory scheme in *Burford* was well established -- is not a sound basis for concluding that abstention is not warranted here.  The reasoning of *Burford* did not turn on the fact that the regulatory scheme was old, but that it was a comprehensive scheme governing a matter of vital state interest, and one where uniform application of rules was important.  These same concerns apply to our case.

In its brief the Sierra Club defends the injunction by arguing that it was entered only after the court "was informed that the [Edwards Aquifer Authority], on the night before the preliminary injunction hearing, had voted against declaring an emergency . . . ."   In denying the motion to dismiss on abstention grounds, the district court noted that "the Edwards Aquifer Authority voted at its July 31, 1996 hearing that an emergency did not exist and thus no emergency measures needed to

---

[27] *Quackenbush*, 116 S. Ct. at 1725 (emphasis added; quoting *Colorado River Conservation Dist. v. United States*, 424 U.S. 800, 814-16 (1976)).

15

be taken . . . .  This Court, based on the documentary and testimonial evidence heard to date, believes than an emergency does exist."  What the court's action indicates is that it is willing to abstain as long as the state authority agrees with it.  The purpose of *Burford* abstention is to discourage such federal court second-guessing of state regulatory matters.  *Burford* abstention is particularly appropriate where "[b]y proceeding the district court would have risked reaching a different answer than the [state] institutions with greater interest in and familiarity with such matters."[28]

The Sierra Club argues that the Edwards Aquifer Act does not provide any state court judicial review for a plaintiff such as itself.  The Sierra Club may be correct, since, unlike the Endangered Species Act,[29] there is no express private citizen cause of action created in the Edwards Aquifer Act for entities such as environmental groups to seek judicial redress for statutory violations.  The defendants argue that there is provision for state court review in the state Act, since § 1.11(h) of the Edwards Aquifer Act provides that the Authority is subject to the Texas Administrative Procedure Act.[30]  It is unclear, however, whether this provision gives a private cause of action or confers standing on an environmental group like the

---

[28] *Wilson*, 8 F.3d 311 at 315.

[29] *See* 16 U.S.C. § 1540(g).

[30] The Texas Administrative Procedure Act is now codified at TEX. GOV'T CODE ANN. § 2001.001 *et seq*. (Vernon Supp. 1997).

16

Sierra Club. But as explained above, the Edwards Aquifer Authority is charged with protecting endangered species and is authorized to file civil suits in state district court for injunctive relief, and a separate entity, the Texas Natural Resource Conservation Commission, is authorized to file suit for an order of mandamus against the Authority to compel it to perform its duties.

The Supreme Court has described *Burford* abstention as applicable "[w]here timely and adequate state-court review is available."[31] However, we find no authority that *Burford* abstention cannot apply unless the plaintiff himself has a private, judicial cause of action under the state regulatory scheme, and the Supreme Court has recently stated that there is no "formulaic test for determining when dismissal under *Burford* is appropriate."[32]

Judge Benavides' "dissent" — a dissent, not from the judgment, but from deciding the appeal — treats the Sierra Club as the possessor of a claim of right rather than one of standing. The true interest here is that of the public in the preservation of the fountain darter. The rationale of *Burford* abstention is served by the state's regulation of this enormous water resource rather than by the federal court. At least, that appears to be true from this preliminary injunction record. We state no bar

---

[31] *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989).

[32] *Quackenbush*, 116 S. Ct. at 1726.

17

against the Sierra Club, either in pursuing the merits or in ultimate efforts to protect the water and darters if the State of Texas fails to do so.

The Sierra Club argues that abstention cannot be used to create "negative preemption," meaning that a state cannot set up its own regulatory scheme and then claim that a federal regulatory scheme should be ignored.  It cites *Adams Fruit Co. v. Barrett*.[33]  In that case the plaintiffs, migrant farm workers, were injured and received state worker compensation benefits. They then sued under the federal Migrant and Seasonal Agricultural Worker Protection Act.[34]  The Court held that the state law providing that a worker who receives worker's compensation cannot recover any other benefits did not bar the plaintiffs from pursuing their federal remedy.  It stated that "we refuse to adopt [defendant's] 'reverse' pre-emption principle that would authorize States to withdraw federal remedies by establishing state remedies as exclusive."[35]  This case is not on point since it does not discuss abstention.  The Sierra Club may be confusing preemption with abstention.

Regardless, we agree with the Sierra Club that, as a general proposition, a State should not be able to create a regulatory scheme and then claim that federal regulation of the same subject matter does not apply.  In effect it argues the state Act has

---

[33] 494 U.S. 638 (1990).

[34] 29 U.S.C. § 1801 *et seq*.

[35] 494 U.S. at 648.

18

"preempted" federal review of its federal claim if the federal court abstains. The response to this argument, however, is that the same thing happens *whenever* a federal court abstains and the plaintiff has asserted a federal claim. This is almost always the case with *Younger* abstention,[36] where the plaintiff brings suit in federal court, seeking to enjoin a state proceeding on grounds that his federal constitutional rights are being violated.

Another weakness in the Sierra Club's "negative preemption" argument is that the Endangered Species Act cannot fairly be described as an attempt to preempt all state law related to conservation and the protection of endangered species. The Act itself states: "It is further declared to be the policy of Congress that Federal Agencies shall cooperate with State and Local Agencies to resolve water issues in concert with conservation of endangered species."[37] The language of the federal Act does not suggest that abstention is to be avoided in cases brought under it.

The Sierra Club also argues that abstention should not apply because there is no state administrative proceeding underway with which the federal proceeding is in conflict. We find this argument factually and legally unavailing. Factually, the record indicates that the Edwards Aquifer Authority has proceeded with rulemaking for the granting of permits and critical period

---

[36] *See Younger v. Harris*, 401 U.S. 37 (1971).

[37] 16 U.S.C. § 1531(c)(2).

management, and has already declined to declare an emergency. The federal court's injunction conflicts with these actions. Legally, *Burford* abstention does not require the existence of an ongoing state proceeding with which the federal court action directly interferes. This requirement is found with *Younger* abstention, which applies "when federal court jurisdiction would interfere with pending criminal, civil, or administrative state proceedings," and requires that "the pending state proceeding must be ongoing and judicial in nature."[38]

For these reasons, we conclude that the district court erred in granting the preliminary injunction. The order granting the injunction is VACATED.

---

[38] *Baran v. Port of Beaumont Navigation Dist.*, 57 F.3d 436, 441 (5th Cir. 1995).

BENAVIDES, Circuit Judge, dissenting:

The *Burford* abstention doctrine applies only "[w]here timely and adequate state-court review is available." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361, 109 S. Ct. 2506, 105 L.Ed.2d 298 (1989) (*NOPSI*). Because the administrative scheme enacted by the State of Texas does not afford adequate judicial review of the Sierra Club's federal claim, *Burford* is inapplicable. Therefore, I cannot agree with the majority's conclusion that "[t]he Sierra Club failed to meet the first requirement of a preliminary injunction -- a substantial likelihood of success on the merits -- because abstention appears so manifestly warranted under *Burford*."

I.

When Congress enacted the Endangered Species Act, it explicitly provided that "any person may commence a civil suit on his own behalf to enjoin any person ... who is alleged to be in violation of this chapter or regulation issued under the authority thereof ...." 16 U.S.C. § 1540(g)(1)(A). The appellants acknowledge that the district court had federal subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 and the Endangered Species Act, 16 U.S.C. § 1540(c).[39] The Supreme Court has long recognized that federal courts have a "virtually unflagging" obligation to exercise the jurisdiction conferred upon them by Congress. *See, e.g.*, *NOPSI*, 491 U.S. at

---

[39] The Endangered Species Act provides that "[t]he several district courts of the United States ... shall have jurisdiction over any actions arising under this chapter." 16 U.S.C. § 1540(c).

21

359. Although this duty is not absolute, abstention is "the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S. Ct. 1236, 47 L.Ed.2d 186 (1984). Specifically, the Supreme Court has recently emphasized that *Burford* abstention applies only in a "narrow range of circumstances." *Quackenbush v. Allstate Insurance Co.*, — U.S. —, 116 S. Ct. 1712, 1725, 135 L.Ed.2d 1 (1996).

## II.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land ..., any Thing in the Constitution or the laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, § 2. The Supremacy Clause makes federal law binding on the "Judges in every State." *Id.* Pursuant to this constitutional provision, state courts are obligated to exercise judicial review of federal claims properly within their jurisdiction.

Abstention involves a federal court's refusal to exercise jurisdiction it clearly possesses in favor of a state court's exercise of jurisdiction. Thus, when a federal court abstains in a case in which a federal question is presented, state courts are obligated to exercise judicial review of that claim. If, for some reason, the state court does not have jurisdiction to review the federal claim, abstention is inappropriate. For example, this court has recognized that *Burford* abstention is inapplicable when a federal court has exclusive jurisdiction over the

plaintiff's federal claim. *See Evans v. Dale*, 896 F.2d 975, 978–79 (5th Cir. 1990).

The Supreme Court has required *Burford* abstention in only two cases. The first, *Burford v. Sun Oil Co.*, 319 U.S. 315, 316–17, 63 S. Ct. 1098, 87 L.Ed. 1424 (1943), involved a challenge to the validity of an order of the Texas Railroad Commission. The plaintiffs asserted state law claims and argued that the Commission's order violated their right to due process of law under the Constitution.[40] *Id.* at 317. The Court ultimately concluded that the federal court should stay its hand because federal court litigation "threatened the purpose of the complex administrative system that Texas had established." *Quackenbush*, 116 S. Ct. at 1725 (citing *Burford*, 319 U.S. at 332).

---

[40] The *Burford* Court repeatedly emphasized that state law issues were predominant and that the federal constitutional claim bordered on the frivolous. *See, e.g.*, *id.* at 325 ("While the constitutional power of the Commission to enforce [the challenged rule] or to make exceptions to it is seldom seriously challenged, the validity of particular orders from the standpoint of statutory interpretation may present a serious problem, and a substantial number of such cases have been disposed of by the Texas courts which alone have the power to give definite answers to the questions of State law posed in those proceedings" (citations omitted)); *id.* at 328 ("The federal court has been called upon constantly to determine whether the Railroad Commission has acted within the scope of statutory authority, while the important constitutional issues have, as the federal court has repeatedly said, been fairly well settled from the beginning"). It is undisputed, of course, that the Sierra Club has asserted no state law claims against the appellants. This fact alone distinguishes the instant case from *Burford* and suggests that abstention is not appropriate. *Cf. NOPSI*, 491 U.S. at 361 (reversing this court's application of *Burford* abstention and noting that the case did not involve a state-law claim); *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993) (holding that "whether the cause of action arises under federal or state law" is a relevant factor in assessing the applicability of *Burford* abstention).

23

Prior to reaching this conclusion, however, the Court noted that "judicial review of the Commission's decisions in the state courts [was] expeditious and adequate." *Burford*, 319 U.S. at 334. Essential to this conclusion, moreover, was the fact that the state courts were available to hear the plaintiffs' federal due process claim. In this regard, the Court specifically noted that "if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here." *Id.*

Similarly, in *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 343, 71 S. Ct. 762, 95 L.Ed. 1002 (1951), the plaintiff challenged an order of the Alabama Public Service Commission under state law and argued that the order "amounted to a confiscation of its property in violation of the Due Process Clause of the Fourteenth Amendment."[41] The Court held that because "adequate review of an administrative order based upon predominantly local factors [was] available to appellee, intervention of a federal court [was] not necessary for the protection of federal rights." *Id.* at 349. In emphasizing the adequacy of state-court review of the plaintiff's federal constitutional claim, the Court noted that the plaintiff "ha[d]

---

[41] The Court noted that its concern was "limited to the propriety of a federal court injunction enjoining enforcement of a state regulatory order." *Id.* at 346. The instant case is distinguishable from both *Burford* and *Alabama Public Service Commission* because it does not involve an action for injunctive relief against a state regulatory commission. For this reason, moreover, the Court's concern about federal court interference with state regulatory orders is not implicated by the Sierra Club's lawsuit against the appellants.

24

not shown that the Alabama procedure for review of Commission orders [was] in any way inadequate to preserve for ultimate review in this Court any federal questions arising out of such orders." *Id.*

The majority does not explain its justification for finding that "adequate state-court review is available." *NOPSI*, 491 U.S. at 361. One can only presume that it reaches this conclusion because "the Edwards Aquifer Authority is charged with protecting endangered species and is authorized to file civil suits in state district court for injunctive relief, and a separate entity, the Texas Natural Resource Conservation Commission, is authorized to file suit for an order of mandamus against the Authority to compel it to perform its duties." Nonetheless, the majority concedes that "[i]t is unclear ... whether [the Edwards Aquifer Act] gives a private cause of action or confers standing on an environmental group like the Sierra Club."

Similarly, the appellants argue that state remedies "afford timely and adequate review of the Authority's protection of endangered species." This contention is debatable because the Act only *authorizes,* but does not *require*, the Authority and the Texas Natural Resource Conservation Commission to protect endangered species. In any event, the appellants' argument misses the point.

While it was important that the state administrative schemes in *Burford* and *Alabama Public Service Commission* provided adequate judicial review of the orders of the state commissions,

25

that was only because the plaintiffs were challenging orders of the commissions, who were defendants in those cases. Adequate review of the commissions' orders in those cases was a necessary, albeit insufficient, justification for applying *Burford* abstention. Indeed, the Court relied on the fact that there was "adequate state-court review" of the plaintiffs' federal claims.

Thus, even assuming that Texas's administrative scheme provides adequate judicial review of the activity of the Authority, this does not justify this court's exercise of *Burford* abstention. First, the adequacy of judicial review of the Authority's action is irrelevant in this case because the Sierra Club is not challenging an order of the Authority. *See* note 3 and accompanying text. Second, adequate review of the Authority's decisions does not change the fact that there is no judicial review of the Sierra Club's federal claim.

Adequate state-court review of a plaintiff's federal claim is a necessary prerequisite to *Burford* abstention for two reasons. First, as noted, the Supremacy Clause requires state courts to enforce federal laws. It would defeat the purposes underlying that protection for federal courts to abstain in cases raising federal claims where the state courts do not provide adequate judicial review of those claims. Second, adequate state-court review of a plaintiff's federal claims is necessary to ensure that the Supreme Court is able to maintain jurisdiction over those claims should the state courts fail to provide sufficient protection for federal rights.

26

Neither the majority nor the appellants seriously dispute the Sierra Club's contention that it cannot bring an Endangered Species Act claim within the auspices of the Edwards Aquifer Act.[42]  Instead, the appellants claim that the "Sierra Club is free to bring its ESA claims in the State courts of Texas ...."  Assuming this is true, however, the appellants' argument ignores the rationale justifying *Burford* abstention in the first place.

The Supreme Court has explained that "*Burford* is concerned with protecting complex state administrative processes from undue federal interference."  *NOPSI*, 491 U.S. at 362.  Therefore, in an appropriate case, a federal court must defer to the state court's administrative scheme.  In the absence of adequate review of a plaintiff's federal claim within that scheme, however, deference to state courts does not further the policies justifying *Burford* abstention.[43]

To find authority for the proposition that "adequate state-court review" must occur within the state administrative scheme, one need look no further than *Burford* itself.  There, the Court

---

[42]  The majority concedes that "[t]he Sierra Club may be correct, since, unlike the Endangered Species Act, there is no express private citizen cause of action created in the Edwards Aquifer Act for entities such as environmental groups to seek judicial redress for statutory violations."  (citation omitted).

[43]  *See McNeese v. Board of Educ. Community Unit Sch. Dist. 187*, 373 U.S. 668, 674-75, 83 S. Ct. 1433, 10 L.Ed.2d 622 (1963) (declining to apply *Burford* abstention in a school desegregation case brought pursuant to section 1983 because it was not clear that state law provided the plaintiffs "with an administrative remedy sufficiently adequate to preclude prior resort to a federal court for protection of their federal rights").

explained the need for abstaining in favor of a uniform and comprehensive scheme of state-court review:

> To prevent the confusion of multiple review of the same general issues, the legislature provided for concentration of all direct review of the Commission's orders in the State district courts of Travis County. The Texas courts have authoritatively declared the purpose of this restriction: If an order of the commission, lawful on its face, can be collaterally attacked in the various courts and counties of the state on grounds such as those urged in the instant case, interminable confusion would result.... Concentration of judicial supervision of Railroad Commission orders permits the state courts, like the Railroad Commission itself, to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field....  The very 'confusion' which the Texas legislature and the [State] Supreme Court feared might result from review by many state courts of the Railroad Commission's orders has resulted from the exercise of federal equity jurisdiction.

319 U.S. at 327 (internal quotations and citations omitted).  *See also Alabama Pub. Serv. Comm'n*, 341 U.S. at 348 ("Statutory appeal from an order of the Commission is an integral part of the regulatory process under the Alabama Code.  Appeals, concentrated in one circuit court, are supervisory in character."); *NOPSI*, 491 U.S. at 374 (Rehnquist, C.J., concurring) (agreeing with the Court that abstention was inappropriate, but noting that he "would not foreclose the possibility of *Burford* abstention in a case ... [where] the State consolidated review of the orders of local ratemaking bodies in a specialized state court with power to hear a federal preemption claim").

The Sierra Club's Endangered Species Act claim cannot be raised within the scheme that Texas has established to regulate

28

Edwards Aquifer water.  In this important sense, then, the state's administrative scheme is not uniform and comprehensive in the same manner the Supreme Court has considered dispositive.  In fact, "the very confusion" the *Burford* doctrine seeks to avoid would result "from review by many state courts" of claims brought under the Endangered Species Act.  *Burford*, 319 U.S. at 327.

                              IV.

The appellants' abstention argument amounts to nothing more than a plea for this court to abrogate its duty to enforce a federal right granted to private citizens by Congress because doing so would potentially conflict with important local interests.[44]  The Supreme Court has recognized, however, that *Burford* "does not require abstention whenever there exists [a state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy."  *NOPSI*, 491 U.S. at 362 (quoting *Colorado River Water*

---

[44]    Indeed, Congress recognized that enforcement of the Endangered Species Act might conflict with important local interests.  *See* 16 U.S.C. § 1535.  Therefore, Congress declared that "[i]n carrying out the program authorized by [the ESA], the Secretary [of the Interior] shall cooperate to the maximum extent practicable with the States."  *Id.* § 1535(a).  In this regard, Congress authorized the Secretary "to enter into a cooperative agreement ... with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species."  *Id.* § 1535(c).
    Thus, the Endangered Species Act establishes an avenue whereby states can minimize federal interference.  Nonetheless, the appellants do not claim to have followed the procedures outlined in the Act for entering into a cooperative agreement with the federal government.  *See id.* § 1535(c)(1).  Nor do the appellants claim to have established an "adequate and active program for the conservation of endangered species" under the Act.  *See id*.  These circumstances render the majority's deference to the state's administrative scheme particularly unwarranted.

*Conservation Dist.*, 424 U.S. at 815-16).  More important, the appellants' contention is flatly inconsistent with a governmental system in which federal law is supreme.

Because the Edwards Aquifer Act does not provide adequate judicial review of the Sierra Club's federal claim, I would find the *Burford* abstention doctrine inapplicable and would reach the arguments raised by the appellants with respect to the extraordinary and extensive order appealed from herein.  For the foregoing reasons, I respectfully dissent.